```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION

LINDA D. WESTBROOK,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )     No. 4:06 CV 997 DDN
                                   )
MICHAEL J. ASTRUE,[1]              )
Commissioner of Social Security,   )
                                   )
            Defendant.             )
                                   )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security partially approving the applications of plaintiff Linda Westbrook for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381 et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 4.)

## I. Background

Plaintiff Linda Westbook is a 49-year-old woman, born on February 6, 1958. (Tr. 36.) Westbrook measures 5'6" with a weight that has ranged from 180 pounds to 246 pounds. (Tr. 78, 253.) Westbrook received a high school education and is literate. (Tr. 36-37, 121, 126.)

From 1982 to 1993, Westbrook worked for Apex Oil (and its subsequent spin-off), where she loaded computer tapes, printed reports, and entered billing data. (Tr. 38-40, 122, 133.) For three months in 1999, she worked for Business Response, where she was a telemarketer. (Tr. 41-42, 116, 133.) After the three months, Westbrook quit to join BJC Health System, where she handled appointments and scheduling for the

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as defendant in this suit. 42 U.S.C. § 405(g).

radiology department. She also collected the department's x-rays, MRIs, and CAT scans. She was fired from BJC Health System on March 18, 2002, for missing work, and has not worked since. (Tr. 43-47, 116-17, 133.)

Westbrook filed her application for disability benefits on May 19, 2003, alleging she became disabled on March 18, 2002. (Tr. 108.) Her application did not list any specific conditions. (Id.) In her disability report, Westbrook stated that her back injury and carpal tunnel syndrome limited her ability to work. (Tr. 121.) She stopped working on March 18, 2002, because of a neuroma in her right foot.[2] (Tr. 122.)

A hearing was held on August 30, 2004. (Tr. 33-80.) Following the hearing, the Administrative Law Judge (ALJ) issued a partially favorable decision on January 26, 2005. In his decision, the ALJ found Westbrook became disabled on February 17, 2003. (Tr. 14-32.) On May 4, 2006, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 8-10.)

In her complaint, Westbrook alleges she became disabled in June 2002. (Doc. 1 at 2.) In response, the Commissioner admits that Westbrook is disabled, but maintains the onset date occurred on February 17, 2003. (Doc. 5 at 1.) Only the onset date is at issue. (Doc. 18; Doc. 21.)

## II.  Medical History

Linda Westbrook originally claimed she became disabled on March 18, 2002. In her complaint, she now claims she became disabled in June 2002. Since only the onset date is at issue, the medical history will focus on Westbrook's treatment up until February 17, 2003 - the latest possible date Westbrook became disabled.

Westbrook's relevant medical history begins on February 16, 2001, when she reported hurting her back after trying to pick up a box of paper. (Tr. 171.) She reported hearing a popping sound at the time and stated the pain in her lower back was constant. (Tr. 206.) One week

---

[2] A neuroma is a tumor derived from cells of the nervous system. Stedman's Medical Dictionary, 1029-30, 1046.

later, she had her initial visit with Jerald A. Maslanko, M.D. He prescribed Ibuprofen and Skelaxin.[3] (Tr. 171.)

On March 9, 2001, Westbrook visited Missouri Baptist Hospital, complaining of lower back pain. Dr. Maslanko diagnosed her with a lumbar strain at L4-L5, though he indicated her back was improving and appeared in good alignment.[4] She was able to raise both her right and left legs to ninety degrees and had no radicular symptoms.[5] Her range of motion in the lumbar area was characterized as intact. Westbrook was told she could return to work provided she did no lifting over ten pounds and limited prolonged sitting. Her general appearance and condition on discharge were good. (Tr. 171-78.)

On October 5, 2001, Westbrook visited University Medical Consultants, Inc., complaining of back pain. She noted the back pain had been persistent for the past nine months and prolonged sitting caused significant stiffness. She said her left foot occasionally became numb. Westbrook was able to raise her legs to eighty degrees without difficulty. Physical therapy at home was providing good relief, but she unfortunately stopped. (Tr. 191.)

The examining physician noted tenderness along the lumbosacral spine, and decided to send Westbrook back for physical therapy. There

---

[3] Ibuprofen is an anti-inflammatory drug used to relieve pain and swelling. Skelaxin is a muscle relaxant used to decrease muscle pain. http://www.webmd.com/drugs. (Last visited August 7, 2003)

[4] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990) (1911).

[5] Radiculopathy is a disease of the spinal nerve roots. Stedman's Medical Dictionary, 1308.

were still no radicular symptoms, but she did have facet disease.[6] She was prescribed Vioxx and told to return in six months.[7]  (Id.)

On October 6, 2001, Westbrook underwent a wrist radiography for her right wrist.[8] Examining the x-rays, John H. Niemeyer, M.D., found no identifiable fracture and no abnormal hardening of the soft tissue. There were no significant arthritic changes either. (Tr. 224.)

On October 18, 2001, Westbrook complained of chest pain, stiffness in her neck, and pain in her left shoulder. She reported a burning sensation that radiated down her collar bone and left arm. At the time, she weighed 211 pounds with a blood pressure of 80/60. The treating physician noted tenderness in the trapezius and pectoral muscles, but no tenderness in the spine. She had limited range of motion when using the trapezius and pectoral muscles. (Tr. 203-04.)

On February 22, 2002, Westbrook underwent a lumbosacral spine radiography. Examining the x-rays, Dale M. Fletcher, M.D., noted there was minimal disk space narrowing at L5-S1, suggesting the possibility of early degenerative disk disease in those vertebrae. Dr. Fletcher also noted facet osteoarthritic changes were present on the lower vertebrae, at L3-4, L4-5, and L5-S1.    (Tr. 223.)

On March 8, 2002, Westbrook visited University Medical Consultants, Inc., complaining of left anterior groin pain. She weighed 192 pounds  and her blood pressure was 112/70. She was diagnosed with trochanteric bursitis, tobacco use, and hypertension, though the treating physician could not find any gynecologic reason for her groin

---

[6] Facet joints are the bony protrusions on the back of each vertebra. The vertebrae are connected by the spinal disks in the front and the facet joints in the back of the spine. Facet disease is the degeneration of the facet joints. http://www.webmd.com/back-pain/tc/Low-Back- Pain-Cause. (Last visited August 13, 2007).

[7] Vioxx was used to treat joint damage and joint pain. The drug is no longer on the market. http://www.webmd.com/drugs. (Last visited August 7, 2007).

[8] A radiography is an examination of any part of the body by x-rays. Stedman's Medical Dictionary, 1309

-4-

pain.[9] She was also diagnosed as mildly depressed, with marked anhedonia and some insomnia.[10] She was prescribed the antidepressant Celexa. (Tr. 186-87.)

On March 18, 2002, Westbrook reported to the emergency room, complaining of pain in her right ankle. The treating physician noted there was no swelling or discoloration and classified the injury as non-urgent. (Tr. 208-211.) X-rays showed a small bone spur, but no bone abnormalities.[11] Christy Bauer, M.D., did not prescribe any treatment and told Westbrook she could return to work on March 21, 2002. (Tr. 211, 222.)

On June 5, 2002, Westbrook visited Saint Louis ConnectCare (ConnectCare), complaining of back pain. She measured 5'6", weighed 180 pounds, and had a blood pressure of 100/80. At first, her back pain was intermittent, but over the last six months, she stated it had become persistent. At the time, she was taking Naproxen, Celebrex, Ibuprofen, Darvocet, Trazodone, Celexa, and Vioxx.[12] Kaili Fan, M.D., took her history. (Tr. 253-55.)

On July 17, 2002, Westbrook visited ConnectCare for flu symptoms. She weighed 186 pounds and had a blood pressure of 100/68. During the examination, the notes indicated Westbrook moved around and got on and off the exam table without any difficulty. (Tr. 252.)

---

[9] Trochanter refers to a bony prominence developed near the upper extremity of the femur. Bursitis is inflammation found in areas subject to friction - like where a tendon passes over a bone. Stedman's Medical Dictionary, 221, 223, 1638.

[10] Anhedonia is the absence of pleasure from the performance of acts that would normally be pleasurable. Stedman's Medical Dictionary, 85.

[11] A spur is a projection from a bone. Stedman's Medical Dictionary, 1459.

[12] Naproxen is used to relieve pain and swelling from various conditions. Celebrex is an anti-inflammatory drug used to treat arthritis. Darvocet is a drug with a narcotic component and is used to treat mild to moderate pain. Trazodone and Celexa are used to treat depression. http://www.webmd.com/drugs. (Last visited August 8, 2007.)

In July 2002, Westbrook began visiting Your Accident & Injury Chiropractic Clinic (Chiropractic Clinic), complaining of back pain. (Tr. 317.) She continued seeking treatment at Your Accident until May 2003. (Tr. 270.) In all, she appears to have visited the clinic over twenty times. (Tr. 270-318.)

On September 6, 2002, Westbrook visited the Department of Rehabilitation at ConnectCare, complaining of lower back pain. She reported her pain being at 9/10. She stated the pain limited her ability to walk, sit, and stand for prolonged periods of time. (Tr. 237.)

On September 17, 2002, Westbrook's physical therapist reported Westbrook's pain had been improving, down to 6/10 from 9/10 on the last visit. Westbrook was stretching, lifting weights, and could ride the stationary bike for six minutes at a moderate speed. (Tr. 233.) The therapist noted mild tenderness within the lumbar area. (Tr. 236.)

On December 16, 2002, the Imaging Center took an MRI of Westbrook's lumbar spine. John Zabrowski, M.D., found the L5-S1 disk space had mild bulging and demonstrated loss of intervertebral disk signal, but demonstrated no evidence of disk protrusion. The L4-5 disk space had a normal disk signal, but mild bulging, contributing to mild to moderate L4 neuroforaminal stenosis.[13] The other lumbar vertebrae, T12-L1, L1-2, L2-3, L3-4, showed no evidence of any problems. (Tr. 288.)

On December 17, 2002, Westbrook visited ConnectCare, complaining of right shoulder pain radiating down her arm. She reported the pain had been constant for the past three weeks. (Tr. 244.)

On December 23, 2002, Westbrook returned to ConnectCare, complaining of a sharp and persistent pain in her right shoulder. She reported having to take Ibuprofen, Tylenol, and Darvocet, together, to dissipate the pain. Despite the pain, the notes indicated she was in

---

[13] Stenosis is the narrowing or constriction of any canal. Stedman's Medical Dictionary, 1473. The neural foramen is the space through which nerve roots exit the spinal canal to form peripheral nerves. Each foramen is a bony canal formed by the pedicles of two adjacent vertebrae. http://www.medcyclopaedia.com/?tt_topic=. (Last visited August 9, 2007.)

-6-

no apparent discomfort and there was no sign of swelling or tenderness in the shoulder. (Tr. 242.)

On December 24, 2002, ConnectCare took x-rays of Westbrook's right shoulder and cervical spine. Dr. Fan and Jesse Poblete, M.D., believed there were signs of minimal degenerative joint disease, but found no fractures, dislocations, or other potential problems with her shoulder. Drs. Fan and Poblete believed there were moderate degenerative changes in the lower cervical vertebrae. (Tr. 263-64.)

On December 30, 2002, Westbrook returned to Connect Care, noting that her current pain medications were not having any effect. A member of ConnectCare prescribed her a trial of Daypro.[14] (Tr. 243.) During a follow-up on January 13, 2003, Charles Lieu, M.D., noted only mild tenderness in her right shoulder. (Tr. 241.)

On February 3, 2003, Gregory Esper, M.D., provided a history of Westbrook's ailments. Her lower back pain began in 2000, he noted, but there were no immediate problems. She had back strain, but did not have any pain, weakness, or numbness in the legs - though she would get leg cramps. Flexeril improved the pain, but physical therapy tended to aggravate it.[15] At the time, Dr. Esper noted she still had pain and cramps, but no weakness. (Tr. 238-39.)

Dr. Esper also noted that in November 2002, she developed pain in her right arm, mostly in the shoulder region. The pain was constant with no relief. Medicines had little effect, except Neurontin.[16] She also noted weakness in her hand and difficulty holding paper or keys. She could hardly write her name on some days and had started using her

---

[14] Daypro is an anti-inflammatory drug used to reduce pain, swelling, and joint stiffness from arthritis. http://www.webmd.com/drugs. (Last visited August 8, 2007.)

[15] Flexeril is a muscle relaxant used to reduce pain. http://www.webmd.com/drugs. (Last visited August 8, 2007.)

[16] Neurontin is used to control seizures and to relieve nerve pain in adults. http://www.webmd.com/drugs. (Last visited August 8, 2007).

left hand. She indicated the pain in her hand shoots from the neck, around the C7 vertebrae. (Id.)

Dr. Esper reviewed an MRI of the lumbar area and found no evidence of a herniated disk or root compression. In his impression, Westbrook had lower back pain but no radiculopathy in the lumbar region. He did note cervical pain and thought she might have radiculopathy at C7, but that further examination was needed. At the time, she weighed 220 pounds and her blood pressure was 110/68. (Id.)

**Medical History After February 17, 2003**

On February 25, 2003, Westbrook completed an accident questionnaire at the Chiropractic Clinic, detailing her February 17, 2003 slip and fall. Largely illegible, Westbrook noted that she had bruised her pelvic bone and also bruised another part of her body. She noted her symptoms were new, and did not predate the fall. Westbrook went to the hospital for her injuries, but there is no contemporaneous report of this visit in the record. (Tr. 282-87.)

On February 27, 2003, Westbrook visited the Chiropractic Clinic, complaining of pain in her neck and pelvic pain. She put her pain level at 7/10. There were no complaints of pain in her back, shoulder, or hand. (Tr. 280.) In her December 2002 reports at the Chiropractic Clinic, Westbrook had complained of back pain. (Tr. 294-95.)

On May 12, 2003, Westbrook visited St. Louis University Hospital (University Hospital) for an MRI of her cervical spine. Mariam Thomas, M.D., and Sohail Maqbool, M.D., noted several problems at multiple vertebrae. At C2-3, there was a central disk protrusion, abutting the anterior thecal sac.[17] At C3-4, there was a central disk bulge, just barely touching the spinal cord. At C4-5, there was a mild diffuse disk bulge. At C5-6, there was a large left lateral disk herniation,

---

[17] The thecal sac is the tube which holds the spinal cord and s    p    i    n    a    l        f    l    u    i    d    . http://www.neurosurgerytoday.org/what/patient_e/tethered.asp. (Last visited August 7, 2007.)

narrowing the neural foramina and compressing the nerve roots.[18] At C6-7, there was a diffuse disk bulge. There were no signs of spinal canal stenosis at any vertebrae. (Tr. 353-54.)

On May 30, 2003, Westbrook visited University Hospital for an electromyography.[19] The test showed evidence of entrapment of the right median nerve at the carpal tunnel. (Tr. 360-61.)

On July 17, 2003, Westbrook visited SLU Care for an examination of her right hand, which she said had been hurting for seven to eight months. David Gray, M.D., noted she had a positive Tinel's sign at the carpal tunnel on her right hand and a negative Tinel's sign at the carpal tunnel on her left hand.[20] The physician diagnosed her with right carpal tunnel syndrome and suggested surgery in the future. (Tr. 428-29.)

On July 25, 2003, Westbrook visited St. Louis University Hospital for a CT scan of her lumbar spine. Sami Nassif, M.D., and Mark Chambers, M.D., noted facet arthropathy and mild diffuse concentric bulging at L3-4, L4-5, and L5-S1.[21] Drs. Nassif and Chambers also noted

---

[18] A herniated disk is a protruded or ruptured disk. The protrusion will compress the nerve root or the cauda equina. Stedman's Medical Dictionary, 260, 455. The cauda equina is a collection of nerves below the end of the spinal cord, which travel down the thecal sac and go to the muscles and skin. http://www.neurosurgerytoday.org/what/patient_e/tethered.asp. (Last visited August 7, 2007.)

[19] Electromyography is a method of recording the electric currents generated in an active muscle. Stedman's Medical Dictionary, 497.

[20] Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve. Stedman's Medical Dictionary, 1422.

[21] Facet arthropathy refers to the pain and discomfort caused by the degeneration of the facet joints. http://www.back.com/causes-mechanical-facet.html. (Last visited August, 14, 2007).

the presence of vacuum phenomenon in both sacroiliac joints.[22]  There were no signs of stenosis.  (Tr. 351-52.)

After meeting with Dr. Gray on August 21, 2003, Westbrook agreed to have carpal tunnel surgery.  (Tr. 433.)  Dr. Gray successfully performed the surgery on September 8, 2003.  (Tr. 443-44.)

On September 29, 2003, Howard Place, M.D., saw Westbrook for back pain.  In a letter to her physician at ConnectCare, Dr. Place noted Westbrook's back pain had been gradually increasing over the past year.  In his impression, she was suffering from lumbar spondylosis, but there was no evidence of radiculopathy or myelopathy.[23]  (Tr. 516-17.)  On October 15, 2003, Dr. Place noted Westbrook was still complaining of back pain and that her symptoms would manifest in her legs one to three times a day.  In his impression, she had lumbar stenosis.  (Tr. 518-19.)  On December 29, 2003, Dr. Place added cervical spondylosis to Westbrook's list of back problems.  At the same time, he gave her a "full work release."  (Tr. 520-21.)

**Testimony at the Hearing**

At the August 30, 2004 hearing, Westbrook described her past work experience.  From 1987 to 1994, Westbrook had worked for Apex Oil, where she loaded computer tapes, printed reports, and entered billing data.  As part of the job, she would be on her feet more than two hours a day and would lift more than twenty pounds.  (Tr. 38-40.)

For three months in 1999, she worked for Business Response, where she was a telemarketer.  As part of the job, Westbrook never lifted anything more than ten pounds and sat most of the day.  (Tr. 41-42.)  After the three months, Westbrook quit to join BJC Health System, where

---

[22] Sacroiliac relates to the sacrum and ilium bones.  The sacrum bone is the segment of the vertebra, which forms part of the pelvis.  The ilium bone is a broad, flaring portion of the hip bone.  Stedman's Medical Dictionary, 1104, 1377.  Vacuum phenomenon indicates degenerative disk disease.  http://www.gentili.net/signs/26.htm. (Last visited August 7, 2007.)

[23] Spondylosis is the stiffening or fixation of the joints within the vertebra.  Myelopathy is a disturbance or disease of the spinal cord.  Stedman's Medical Dictionary, 87, 1013, 1456.

-10-

she handled appointments and scheduling for the radiology department. She also collected the department's x-rays, MRIs and CAT scans, which meant she was on her feet for at least two hours a day. She was fired from BJC on March 18, 2002, after missing a lot of time for medical reasons. (Tr. 43-47.)

In her current state, Westbrook explained that she could sit for no more than ten minutes without being in excruciating pain. Among her ailments, Westbrook complained of a bulging disk in her neck, pain in her lower back, right hand, right shoulder, left knee, and both elbows, and cramps and numbness in both feet. (Tr. 49-51).

Westbrook reported taking Celebrex, Neurontin, Amitriptyline, Ibuprofen, and Arthritis-strength Tylenol for her pain. She reported taking anti-depressants as well, starting with Celexa, then Zoloft, and finally Lexapro. (Tr. 52.)

When examined by her lawyer, Westbrook noted she could stand for no more than twenty minutes before experiencing back pain. Sitting for too long would give way to a burning and numbness -- usually after ten or twenty minutes of sitting. She could no longer type and reported having trouble sleeping at night. She testified that the pain medications caused drowsiness, constipation, sexual dysfunction, and nausea. (Tr. 62-65.) She said all of these ailments dated back to March 18, 2002, including the problems with her hand. (Tr. 66, 78.)

### III.  General Legal Principles

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or

because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

In this case, the Commissioner determined that Westbrook lacked the residual functional capacity (RFC) to perform her past work.

## IV. Decision of the ALJ

On January 26, 2005, the ALJ found that Westbrook became disabled, within the meaning of the Social Security Act, beginning on February 17, 2003. (Tr. 32.) The ALJ began the opinion by summarizing Westbrook's medical history, beginning with her March 18, 2002, admittance to the emergency room. (Tr. 18.) The ALJ ended his discussion of the medical history with a February 11, 2004, letter from Jerry Clerc, a non-physician counselor. (Tr. 21.)

The ALJ noted that Westbrook suffered from a series of impairments. Before February 17, 2003, Westbrook's conditions were moderate degenerative joint disease at C5-6 of the cervical vertebrae, and very mild degenerative disk disease and mild to moderate degenerative joint disease at L4-5 of the lumbar vertebrae. Beyond her back, Westbrook suffered from mild degenerative joint disease of the right ankle, a small calcaneal spur of the right heel, and minimal degenerative joint

disease of the right shoulder.[24]  She also had hypertension and obesity. In combination, these ailments were severe.  (Tr. 22, 30.)

The ALJ found Westbrook's conditions on or after February 17, 2003, were moderate degenerative joint disease and a large left-sided herniated disk at C5-6, with radiculopathy in the left upper extremity, and mild degenerative disk disease and moderate facet arthropathy at L3-S1.  Beyond her back, Westbrook suffered from carpal tunnel syndrome in her dominant right hand, mild degenerative joint disease in her right ankle, a small, calcaneal spur at the right heel, minimal joint disease in her right shoulder, and degenerative joint disease with vacuum phenomenon in both sacroiliac joints.  She also suffered from obesity, hypertension, and depressive disorder.  In combination, these ailments were severe.  (Tr. 22, 30.)

Westbrook also alleged suffering from neuroma in the right foot, leg cramps, and trochanteric bursitis.  However, the ALJ found there was no objective evidence to support the allegations and concluded they were not medically determinable impairments.  The ALJ also declined to find Westbrook suffered from post-traumatic stress disorder.  (Tr. 22.)

Before February 17, 2003, the ALJ found Westbrook had the RFC to perform work activity at the light exertional level -- albeit with some limitations.  Westbrook could never climb ladders, ropes or scaffolds, except in an emergency.  Occasionally, she could climb ramps and stairs, and balance, stoop, crouch, kneel, and crawl.  (Tr. 23, 31.)

On or after February 17, 2003, the ALJ found Westbrook had the RFC to perform work activity at a sedentary level.  She could never climb ladders, ropes, or scaffolds except in an emergency.  She could not crawl except in an emergency.  She could climb ramps and stairs, balance, stoop, crouch, and kneel on occasion.  She could occasionally reach overhead, but could never work overhead.  She could not grip with any power in her dominant right hand.  She could not do any repetitive fingering or handling with her dominant right hand.  The ALJ also determined she was mentally limited to unskilled work.  (Tr. 23, 31.)

---

[24]  Calcaneal refers to the heel bone.  Stedman's Medical Dictionary, 227.

In reaching these findings, the ALJ found Westbrook not entirely credible for the period predating February 17, 2003. By June 2002, Westbrook had lost thirty pounds with diet and exercise, dropping to 180 pounds. But after her fall in the laundromat, her weight rose to 238 pounds. There were other indications Westbrook might have been exaggerating her symptoms. On July 17, 2002, her treating doctor found Westbrook "moved around and got on and off the examining table without any difficulty." In September 2002, Westbrook reported that she was improving, walking occasionally, and feeling pretty good. (Tr. 26.) On December 23, 2002, the range of motion in her right shoulder was only slightly limited. On February 3, 2003, she reported never having fallen asleep during the day. (Tr. 27.)

On February 17, 2003, Westbrook fell at the laundromat, injuring her right arm, neck, and pelvis. After her fall, an MRI of her cervical vertebrae showed a large, left-sided herniated disk at C5-6, which had not existed before her fall. The MRI supported her complaints of radiculopathy in the left upper extremity. After her fall, and for the first time, the ALJ noted, electrodiagnostic evidence pointed to carpal tunnel syndrome in the dominant right hand.[25] After her fall, joint disease in her lumbosacral vertebrae had significantly increased. Significant joint disease also appeared in both her sacroiliac joints. Finally, the ALJ noted that after her fall, Westbrook's sleeping became impaired and her complaints of depression became credible. Between the orthopedic pain and the depression, the ALJ believed Westbrook's mental functioning may have been reduced to the point where she was only capable of unskilled work. (Tr. 27.)

For the period before February 17, 2003, the ALJ concluded that Westbrook's subjective allegations of debilitating pain and disabling functional limitations were not fully credible. The objective medical evidence and the subjective allegations -- to the extent credible -- did not warrant a more restrictive functional limitation than previously found. (Tr. 27.)

---

[25] Electrodiagnosis involves determining the nature of a disease by observing changes in electrical activity. Stedman's Medical Dictionary, 496.

Having determined her limitations, the ALJ looked to see whether Westbrook could have returned to her previous job. With the help of a vocational expert (VE), the ALJ determined that Westbrook possessed the RFC to perform her past relevant work for the period before her fall. Accordingly, Westbrook was not disabled for any period predating February 17, 2003. (Tr. 28, 31-32.)

After February 17, 2003, the ALJ found Westbrook did not have the RFC to return to her previous work -- either as actually done or as generally done in the national economy. (Tr. 28, 31.) Based on her post-fall RFC, the VE testified that there were no jobs in the national economy that Westbrook could perform on a regular and continuing basis. Accepting the VE's testimony, the ALJ concluded that Westbrook was disabled, within the meaning of the Social Security Act, on February 17, 2003. (Tr. 29, 32.)

## V. Plaintiff's grounds for relief

Westbrook argues that the ALJ's decision is not supported by substantial evidence. Specifically, she argues that the ALJ failed to properly apply Social Security Ruling 83-20, and therefore failed to properly determine the onset date. She maintains that the proper onset date is sometime before December 31, 2002. (Doc. 14.)

## VI. Discussion

Once published, a social security ruling is binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984). Social Security Ruling 83-20 sets forth the guidelines for determining the onset date of a claimant's disability. Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997). The onset date is the first day an individual is disabled, as defined by the Social Security Act and its regulations. S.S.R. 83-20, 1983 WL 31249, at *1 (Soc. Sec. Admin. Nov. 30, 1982). To determine the onset date for a non-traumatic injury, the ALJ should consider the applicant's allegations, her work history, and the medical and other evidence of her condition. Id. at *2. Of the three factors, medical evidence serves as the primary element in determining the onset date. Id.

"With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." Id. In these instances, the ALJ will have to infer the onset date, looking to the medical and other relevant evidence that describe the applicant's symptoms and medical history. Id. Any onset date must be supported by a legitimate medical basis. Id. at *3; Grebenick, 121 F.3d at 1200. Convincing rationale must also be given for the date selected. S.S.R. 83-20, 1983 WL 31249, at *3.

In cases where the onset date must be inferred, the ALJ should call on the services of a medical advisor. Id. When an inference is necessary, and the medical evidence relating to the onset date is ambiguous, "SSR 83-20 requires the ALJ to call upon the services of a medical advisor." Grebenick, 121 F.3d at 1201. The corollary is also true. When an inference is necessary, but the medical evidence relating to the onset date is unambiguous, the ALJ does not need to obtain an expert opinion. Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006). On review, the cardinal question is whether the medical evidence concerning the onset date is ambiguous.

In this case, the medical evidence notes a clear progression of orthopedic pain. On October 18, 2001, the examining physician found no tenderness in Westbrook's spine. On February 22, 2002, Dr. Fletcher found disk narrowing at L5-S1, which suggested the possibility of early degenerative disk disease. On June 5, 2002, Westbrook noted her pain was no longer intermittent; for the past six months the pain was persistent. On December 16, 2002, Dr. Zabrowski found mild bulging at L5-S1, and mild to moderate neuroforaminal stenosis at L4-5. On December 17, 2002, Westbrook complained of constant pain in her right shoulder. On December 24, 2002, Drs. Fan and Poblete diagnosed minimal degenerative joint disease. On February 3, 2003, Dr. Esper found no evidence of a herniated disk or radiculopathy in the lumbar region, but thought she might have radiculopathy at C7. Westbrook also noted weakness and pain in her right hand.

Westbrook's fall on February 17, 2003, did not produce any dramatic changes in her progression. On May 12, 2003, Drs. Thomas and Maqbool noted a central disk protrusion at C2-3, bulging disks at C3-4, C4-5,

C6-7, and a herniated disk, compressing the nerve roots at C5-6. On July 17, 2003, Dr. Gray diagnosed right carpal tunnel syndrome. On September 8, 2003, Dr. Gray performed surgery on Westbrook's right hand.

From this progressive pain, the ALJ inferred that Westbrook became disabled after her fall at the laundromat. The ALJ based his decision on the medical evidence, which indicated -- in his opinion -- that Westbrook's symptoms and conditions were disabling after February 17, 2003, but were not disabling before February 17, 2003. The ALJ also took note of Westbrook's work history and subjective complaints, as required by Social Security Ruling 83-20.

Despite the fall at the laundromat, there is no legitimate medical basis for the ALJ's decision to choose February 17, 2003, as the onset date. After her fall at the laundromat, Westbrook completed an accident questionnaire in which she indicated she had bruised her pelvic bone. She indicated the symptoms from the fall were new. In other words, there was no indication the fall had aggravated Westbrook's back, shoulder, or hand problems. Indeed, on February 27, 2003, she again made no mention of any pain in her back, shoulder, or hand. There are no medical records, tests, or visits for the days surrounding the fall at the laundromat, that would support February 17 as the date Westbrook's impairments became disabling.

In his decision, the ALJ drew comparisons between Westbrook's symptoms before and after February 17, 2003. However, the post-February 17 symptoms came from medical examinations performed no earlier than May 12, 2003. The pre-February 17 symptoms came from medical examinations performed no later than February 3, 2003. The medical evidence does not point to February 17, 2003 as the onset date. Instead, the record contains information that Westbrook's pain could have become disabling on any number of dates -- on June 5, 2002, when her back pain first became persistent; on December 16, 2002, when she was diagnosed with mild to moderate neuroforaminal stenosis; on December 24, 2002, when she was diagnosed with degenerative disk disease; or on May 12, 2003, when she was diagnosed with bulging and herniated disks. A medical adviser may well conclude the onset date was yet another date.

The medical evidence is ambiguous and the ALJ erred by failing to call upon a medical adviser to determine the onset date.

## VII. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded. On remand, the Commissioner is instructed to redetermine the onset date of Westbrook's disability with the assistance of a medical advisor, pursuant to Social Security Ruling 83-20.

An appropriate order is issued herewith.

/S/    David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 29, 2007.